**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ARVAL SERVICE LEASE S.A. and
ELEMENT FINANCIAL
CORPORATION,

Plaintiffs,

vs. Case No. 3:14-cv-1047-J-39MCR

J. CHRISTOPHER CLIFTON,
individually, BONNIE CLIFTON,
individually, and ELEMENT ARVAL
LLC, a Florida Limited Liability
Company,

Defendants.

---

**ORDER GRANTING PRELIMINARY INJUNCTION**

**THIS CAUSE** is before the Court on Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in Support, Injunctive Relief Sought, (Doc. 10; Motion), filed on September 4, 2014. Plaintiffs filed three declarations and accompanying exhibits in support of the Motion. (Docs. 10-1, 10-2, 10-4). On September 5, 2014, the Court entered an Order, taking the Motion under advisement, and directing Plaintiffs to promptly effect service of process on Defendants, including serving the Motion and all material filed in support of the Motion, and to provide the Court with proof of such service. (Doc. 11; 09/05/14 Order). On September 18, 2014, Plaintiffs filed proofs of service on Defendants J. Christopher Clifton, Bonnie Clifton, and Element Arval LLC. (See Docs. 15-20). The Court scheduled a hearing on the Motion, and ordered an expedited briefing schedule. (Doc. 22; 09/23/14 Order). Defendants filed a response opposing the Motion on October 1, 2014, supported by two declarations, one with exhibits. (Doc. 32;

Response; and Docs. 33, 34). With leave of Court, Plaintiffs filed a reply brief in support of their Motion, along with three additional declarations with exhibits (Doc. 36; Reply; and Docs. 36-1, 36-2, 36-5), and Defendants filed a sur-reply in opposition to the Motion, and an additional declaration. (Doc. 40; Sur-Reply; and Doc. 41).

Also pending before the Court is Defendants' Motion to Dismiss (Doc. 30; Motion to Dismiss). Plaintiffs have responded in opposition to the Motion to Dismiss (Doc. 45; Response to Motion to Dismiss), and that motion is ripe for consideration. Additionally, Defendants have filed a Motion to Transfer Venue to the Orlando Division of the Middle District of Florida (Doc. 29; Motion to Transfer), to which Plaintiffs have filed a response in opposition. (Doc. 44; Response to Motion to Transfer). Because of the urgency of the issues raised by Plaintiffs' Motion for Preliminary Injunction, the Court will address the Motion to Dismiss only to the extent that it may affect the Court's consideration of the Motion for Preliminary Injunction, specifically Plaintiffs' allegation that Defendants have violated the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"). The Court will otherwise address the Motion to Dismiss and Motion to Transfer in due course by separate order. The Court determines that nothing about these two pending motions, other than the issues addressed herein, impedes or frustrates the Court's ability to address the merits of the Motion for Preliminary Injunction.

The Court held a hearing on the Motion for Preliminary Injunction on October 15, 2014, at which counsel for the parties presented argument. (Doc. 42; 10/15/14 Clerk's Minutes). The Court directed Plaintiffs to file with the Court the Element Arval Amended and Restated Alliance Agreement and Schedule 3 of the Agreement, and granted Plaintiffs' request for permission to do so under seal. See 10/15/14/14 Clerk's Minutes.

Based on the record before the Court, and for the following reasons, the Court finds that Plaintiffs Arval Service Lease S.A. ("Arval") and Element Financial Corporation ("Element") have met the high standard necessary to secure a preliminary injunction against Defendants J. Christopher Clifton, individually, Bonnie Clifton, individually, and Element Arval LLC.

## I. Factual Background[1]

### A. Arval

Arval is a multinational company specializing in full service vehicle leasing with operations in more than twenty-five countries. (Doc. 10-2; Noubel Decl. ¶ 6). In 2000, Arval formed a strategic partnership with PHH Vehicle Management Services, LLC ("PHHVMS"), a subsidiary of PHH corporation ("PHH"), to provide vehicle leasing services, vehicle management services and fuel card services in North America and Europe, including in the United States. Id. ¶ 7. On June 30, 2000, Arval and PHHVMS "defined the terms of their partnership under an Alliance Agreement, which, among other things, appointed PHHVMS as the exclusive partner of Arval in the United States and granted PHHVMS the right to use the ARVAL mark in association with the leasing and fleet management business operating under the trade name PHH Arval." Id. ¶ 8; see also (Doc. 10-4; 09/03/14 Kaplan Decl. ¶¶ 7, 8 (PHHVMS and Arval formed strategic partnership in 2000 "to provide vehicle leasing services, vehicle management services and fuel card services" and Arval "granted PHHVMS the right to use the ARVAL mark" in

[1] The facts herein are drawn largely from the declarations and exhibits submitted by the parties in support of and in opposition to the Motion for Preliminary Injunction. The parties do not dispute the chronology of events.

the United States.)).

Arval registered the ARVAL Trademark on January 14, 2003, "and is the sole owner of US Trademark Registration No. 2,673,741 (the ''741 Registration'). Noubel Decl. ¶ 10; see also (Doc. 10-3 at 2; ARVAL Service Mark Registration). The '741 Registration was successfully renewed on March 6, 2013. Noubel Decl. ¶ 10. "Arval, or PHHVMS as its licensee, have used the ARVAL mark in the United States on a continuous and exclusive basis since at least as early as 2000." Id. ¶ 11.

Arval has invested significant time and money in the last fourteen years, to develop the strong reputation and goodwill associated with the ARVAL mark in the leasing and fleet management industry in the United States. Noubel Decl. ¶ 12.

**B. Element**

Element is a multinational Ontario, Canada-based vehicle and equipment financing company, having its United States headquarters in Sparks, Maryland, and an office in Horsham, Pennsylvania. (Doc. 10-1; 08/27/14 Nikopoulos Decl. ¶ 6).[2] Element has conducted substantial business in the United States since 2010, including through the website www.elementcorp.com. (Doc. 36-1; 10/08/14 Nikopoulos Decl. ¶ 6). Element's presence in the United States market was accomplished, in part, by its well-publicized purchase of certain assets from Alter Moneta Corporation in August 2011, including its equipment finance portfolio, and fleet rental financing and leasing assets. Id. "The Alter Moneta business was rebranded under the ELEMENT mark after the purchase." Id.

---

[2] In 2013, total revenue generated by Element's United States subsidiaries was more than $29 million, and Element's finance receivable in the United States as of December 31, 2013, was more than $775 million. 08/27/14 Nikopoulos Decl. ¶ 11.

Additionally, in 2012, Element acquired CoActive Capital Partners, a commercial equipment leasing finance company specializing in providing financing to United States equipment manufacturers, in order "to strengthen [Element's] U.S. equipment vendor platform." Id. ¶ 8. The purchase was accomplished through $100 million in equity financing to fund the transaction and related growth, and was well-publicized. Id. Element "rebranded" the CoActive business "under the ELEMENT mark after the purchase." Id.

"Element is the exclusive owner of all rights, title and interest in the trademark ELEMENT," which is a "source identifier of Element's business, and has been used in such capacity since at least as early as 2007." 08/27/14 Nikopoulos Decl. ¶¶ 7, 8. Element has been using the ELEMENT mark throughout North America since 2007, including on its website, which is accessible to United States consumers. Id. at ¶ 12. "The ELEMENT mark has been used in conjunction with the vehicle and equipment financing business throughout the United States since at least as early as August 2011." Id. ¶ 9. "During this time, Element has extensively advertised and publicized the ELEMENT mark in the vehicle and equipment financing sector throughout the United States and has invested significant time and money in promotion of the ELEMENT mark." Id. ¶ 10. According to Element's vice president and general counsel Jim Nikopoulos, "the ELEMENT mark is well recognized in the vehicle and equipment financing business and has generated significant goodwill and brand recognition." Id. ¶ 13.

In September 2013, Element engaged PHH in discussions regarding the potential sale of the PHHVMS, PHH's fleet management business, including the PHH Arval strategic partnership which provides financial and management services for commercial

vehicle fleets. 08/27/14 Nikopoulos Decl. ¶ 14; 09/03/14 Kaplan Decl. ¶ 9.

On June 2, 2014, "PHH and Element entered into a Stock Purchase Agreement, pursuant to which PHH agreed to sell its fleet management business to certain wholly owned subsidiaries of Element for approximately $1.4 billion in cash." 09/03/14 Kaplan Decl. ¶ 10. The PHH-Element Stock Purchase Agreement became public on June 3, 2014, when it was filed with the United States Securities and Exchange Commission ("SEC"). (Doc. 33; 10/01/14 Clifton Decl. ¶ 8). The Stock Purchase Agreement closed on July 7, 2014, and was deemed effective as of July 1, 2014. Id. ¶ 18.

Element has never filed any trademark application with the United States Patent and Trademark Office ("USPTO") for the trademark ELEMENT for use in any class of goods and services. 10/01/14 Clifton Decl. ¶ 14. On September 18, 2014, Element's subsidiary, Element Fleet Management filed an application with the USPTO to register the mark ELEMENT FLEET MANAGEMENT. 10/08/14 Nikopoulos Decl. ¶ 11; (Doc. 34-1). The Application has been examined and allowed by the USPTO. 10/08/14 Nikopoulos Decl. ¶ 11. Element had filed an Intent to Use application for the mark MAKING CAPITAL WORK, on June 10, 2014. (Doc. 34-2).

### C. The Amended and Restated Alliance Agreement ("Element Arval Alliance Agreement")

"After Element's purchase of PHHVMS in 2014, Arval and Element have engaged in a global strategic partnership in North America, including branding of the partnership under the mark ELEMENT ARVAL," called the Element Arval Alliance. Noubel Decl. ¶ 13. The Amended and Restated Alliance Agreement by and between Element Vehicle Management Services, LLC ("EVMS LLC") and Arval ("Element Arval Alliance

Agreement") was executed on July 22, 2014. 10/08/14 Nikopoulos Decl. ¶ 10. "[H]owever, due to the uncertainty surrounding use of the preferred name ELEMENT ARVAL at the time of execution, Element and Arval were forced to remove portions of the agreement related to the 'Alliance Name' from the main agreement. Element and Arval did not execute the 'Alliance Name' portion of the Element Arval Alliance Agreement or proceed with the portion of their transaction related to the 'Alliance Name' at the time of execution of the Element Arval Alliance Agreement." Id.

Under the terms of the Element Arval Alliance Agreement, "Arval has granted Element a license to use the ARVAL mark in furtherance of its joint vehicle financing and fleet management business in the United States." Noubel Decl. ¶ 14. The Element Arval Alliance Agreement refers to EVFS LLC and Arval as "Founders," and embodies an international business alliance for the purpose of EVFS LLC, Arval and Alliance Members providing vehicle leasing, vehicle management and fuel card services to clients throughout the world. (Doc. S-48; Element Arval Alliance Agreement Art. 2)). The territory of EVFS LLC "and its affiliates"[3] includes the United States. Id. at 12. The Element Arval Alliance Agreement provides that EVFS LLC and Arval and Alliance Members

> will be permitted to identify themselves within their respective Territories as members of the Alliance. Upon selection of the

---

[3] "Affiliate" is defined as:

> with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person."

Element Arval Alliance Agreement ¶ 1.1. "Person" refers to an individual, a corporation, limited liability company, or a host of other business entities listed. Id.

> brand name for the Alliance, the Founders will amend this Agreement . . . to specify such brand name herein. The Alliance Members will not be permitted to conduct business under the names "Element-Arval" or "Arval-Element," or under any confusingly-similar trademarks. . . .
>
> . . . All trademarks, service marks, trade names, logos, or other words or symbols identifying the Services or the Business of either Founder (the "Marks") will remain the exclusive property of the respective Founder, whether or not specifically recognized or perfected under local laws . . . .

Id. ¶¶ 6.1, 6.2. EVFS LLC and Arval remain independent businesses. Id. ¶ 14.10. On October 1, 2014, EVFS LLC and Arval amended the Element Arval Alliance Agreement to provide that they and the Alliance Members will be permitted to identify themselves as members of the "Element-Arval Global Alliance." Id. at 10/01/14 Amendment.

**D. J. Christopher Clifton**

Defendant J. Christopher Clifton is an attorney, admitted to the bars of New York, Connecticut, Pennsylvania and Indiana. 10/01/14 Clifton Decl. ¶ 3. PHH hired Mr. Clifton in February 2009, as Vice President in PHH's legal department. 09/03/14 Kaplan Decl. ¶ 11. Over the next five years, PHH promoted Mr. Clifton multiple times, eventually to the position of Senior Vice President, Deputy General Counsel & Assistant Secretary. Id. ¶ 12; 10/01/14 Clifton Decl. ¶ 4. Mr. Clifton agreed to fully comply with PHH's Code of Business Ethics & Conduct, which includes fully complying with all applicable laws and regulations. The Code also includes provisions concerning the appropriate use of intellectual property and conflicts of interest. 09/03/14 Kaplan Decl. ¶¶ 13, 15, 16.

In his role as senior attorney for PHH, Mr. Clifton was involved in the negotiations between PHH and Element regarding the sale of PHH's fleet business, (Element-PHH Stock Purchase Agreement), and had access to confidential documents and proprietary

information. 09/03/14 Kaplan Decl. ¶¶ 17, 18. In the weeks prior to the sale, Mr. Clifton participated in one or more of the "due diligence" teleconferences conducted by counsel and employees of PHH and Element to discuss the sale. 10/08/14 Nikopoulos Decl. ¶ 9. "During these teleconferences, participants routinely discussed the status of ongoing negotiations for the continuation of [PHHVMS's] alliance with Arval after the Sale (the 'Element Arval Alliance Agreement')." Id. Specifically, Mr Clifton was provided with drafts of the Stock Purchase Agreement and comment, including on May 11, 2014, and May 31, 2014. (Doc. 36-2; 10/08/14 Kaplan Decl. ¶ 6); (Docs. 36-3 and 36-4). Mr. Clifton states that he had "no direct involvement in the negotiations between PHH and [Element] pertaining to the provisions of the Stock Purchase Agreement dated as of June 2, 2014 . . . , between PHH and [Element]," and that he did not "prepare the Stock Purchase Agreement or any other transaction documents . . . ." 10/01/14 Clifton Decl. ¶¶ 5, 6. Rather, Mr. Clifton states that his involvement with the Stock Purchase Agreement "was limited to assisting PHH's outside counsel in the preparation of certain ancillary schedules and exhibits to the Stock Purchase Agreement." Id. ¶ 7. He states that he does not recall reviewing or commenting on a draft of the Stock Purchase Agreement on May 11, 2014, and that his May 31, 2014 review was limited to a specific provision of the Stock Purchase Agreement, not related to the provision that requires the new entity to cease using the PHH brand. (Doc. 41; 10/14/14 Clifton Dec. ¶¶ 3, 4).

Leith W. Kaplan, currently PHH Senior Vice President, Chief Risk and Complaince Officer, states that

> 21. Beginning on or about June 30, 2014, after having access to information related to PHH Arval's rebranding strategy and potential use of the ELEMENT ARVAL mark, Mr.

> Clifton began to purchase and register internet domain names that consisted entirely or partially of the ELEMENT and ARVAL marks. ["Domain Names"]. Furthermore, by his own admission, Mr. Clifton configured those domain names to redirect web traffic to the website of a direct competitor in the fleet management sector, ARI. Mr. Clifton explained that the intent of directing web traffic to a competitor's website was to further increase the value of the infringing domain names, as well as Mr. Clifton's profits should he successfully sell the infringing domains to Element.

09/03/14 Kaplan Decl. ¶ 21. Mr. Clifton states that he learned on June 30, 2014, following his review of the publically filed PHH-Element Stock Purchase Agreement, that Element would be required to cease using the "PHH" trademark and any internet domain names incorporating the "PHH" trademark, including www.phharval.com, within six months following the close of the transaction. 10/01/14 Clifton Decl. ¶ 9. "At no time have I been privy to any confidential or otherwise non-public information or discussions pertaining to [Element's] plans or intentions with respect to the re-naming or re-branding of PHH Vehicle Management Services, LLC . . . ." Id. ¶ 10. Additionally, Mr. Clifton states that he has not "been privy" to any discussions or any agreement between Element and Arval. Id. ¶¶ 11, 12.

Mr. Clifton states that on June 30, 2014, he registered "domain names with various domain extensions" using his wife, Bonnie Clifton's "Register.com account," which had been created in 2007 in connection with her small business. 10/01/14 Clifton Decl. ¶ 17; see also 10/08/14 Kaplan Decl. ¶ 7 ("On July 7, 2014, Mr. Clifton admitted to [Mr. Kaplan] that he had personally registered (using an account established by his wife Bonnie Clifton) various website domain names related to the PHH Arval fleet business and Element in anticipation that those companies might be interested in purchasing one or

more of those domain names at some point in the future."). Mr. Clifton states that, prior to doing so, on June 30, 2014, he "researched the applicable statutory and case law pertaining to the Anticybersquatting Consumer Protection Act." Additionally, he conducted a computer search and determined that the mark ELEMENT ARVAL had not been registered with the USPTO, and no such registration was pending; that the marks ELEMENT, ELEMENTS, AND ELEMENTS FINANCIAL had all been registered by entities other than Defendant Element; that the mark ELEMENT FLEET MANAGEMENT was pending registration with the USPTO pursuant to an Intent to Use application filed by an entity other than Defendant Element; the mark ARVAL was registered "in different classes of goods and services by different entities;" and the marks ELEMENT and ELEMENT ARVAL "did not appear to have yet been used in commerce in the U.S. in the vehicle fleet management services industry." Id. ¶ 20.

On July 8, 2014, Mr. Clifton created a new "Register.com account" and transferred the initial Domain Names to the new account and then registered additional names using the new account. 10/01/14 Clifton Decl. ¶ 19. Mr. Clifton states that at the time he registered the subject Domain Names, he believed, based on his research, that the registration of the Domain Names was lawful and not in violation of the ACPA. 10/14/14 Clifton Decl. ¶ 10.

On July 10, 2014, Mr. Clifton formed "Element Arval LLC," a Florida limited liability company. 09/03/14 Kaplan Decl. ¶ 27; 10/01/14 Clifton Decl. ¶ 21; see also Doc. 10-7; Articles of Organization). Also on July 10, 2014, "Mr. Clifton electronically filed at least one 'intent to use' trademark application with the [USPTO] for the mark ELEMENT ARVAL, which was given U.S. Trademark Application Serial No. 86/333,162." 09/03/14

Kaplan Decl. ¶ 28; see also 10/01/14 Clifton Decl. ¶ 21; (Doc. 10-8; Trademark/Service Mark Application). The next day, July 11, 2014, Mr. Clifton assigned all of the Domain Names held through the new Register.com Account to Element Arval LLC. 10/01/14 Clifton Decl. ¶ 22.

Mr. Clifton spoke with Mr. Kaplan, PHH Senior Vice President, and notified him of the steps he had taken to register the Domain Names, to form Element Arval LLC, and to file an Intent to Use trademark application with the USPTO for the trademark ELEMENT ARVAL. 10/01/14 Clifton Decl. ¶ 24; 09/03/14 Kaplan Decl.¶ 22; 10/14/14 Clifton Decl. ¶ 9. Mr. Clifton told Mr. Kaplan of his "desire and intentions to approach [Element] to determine whether [Element] may have any interest in acquiring Element Arval LLC or in-licensing any of Element Arval LLC's intellectual property." Mr. Clifton requested PHH's approval for him to approach Element regarding its interest in acquiring Element Arval LLC or licensing any of the LLC's intellectual property. 10/01/14 Clifton Decl. ¶ 24. Mr. Clifton also admitted to Mr. Kaplan "that he had set those domain names to redirect to one of PHH and Arval's competitors in the fleet business." 10/08/14 Kaplan Decl. ¶ 8. In the conversation, Mr. Kaplan "instructed" Mr. Clifton to remove the links from the Domain Names to the competitors, and to relinquish the Domain Names. 09/03/14 Kaplan Decl. ¶ 22. However, on that same date, Mr. Clifton "began to purchase and register over 100 additional internet domain names that consisted entirely or partially of the ELEMENT and ARVAL marks . . . ." Id. ¶ 23. "Upon information and belief, one or more of the Domains was registered by [Defendant] Mrs. Clifton using an account that Mrs. Clifton had established with the domain registrar." Id. ¶ 24. A list of 108 Domain Names are attached to the 09/03/14 Kaplan Declaration. (Doc. 10-5 at 2). A random sampling of the

Domain Names registered by Mr. Clifton or Mrs. Clifton includes:

element-arval.biz
elementarvalfleet.biz
elementfinancial.biz
elementfleet.biz
element-arval.co
elementfinancialcorp.com
element-arval.com
elementarvalfleet-us.com
elementvms.us.com

Id.; (see also Doc. 8-2).

Using the newly registered Domain Names, Mr. Clifton "created shell websites from which to advertise and offer for sale the very domain names that had just been registered." 09/03/14 Kaplan Decl. ¶ 25; see also (Doc. 10-6; Screenshot of Website bearing the name Element Arval LLC). Additionally, certain of the Domains contained "click-through links to third party advertising and sales offers related to vehicle leasing and finance." 09/03/14 Kaplan Decl. ¶ 26. Throughout July 2014, "tweets" originated by "ElementArval" were sent to various entities under the heading "Attention Fleet Industry Participants!" (Doc. 10-10).

Mr. Clifton contacted Mr. Kaplan "multiple times regarding his acquisitions, which he characterized as 'various domain names that Element Financial Corp. may or may not have any interest in acquiring[.]" 09/03/14 Kaplan Decl. ¶ 29. Mr. Clifton related to Mr. Kaplan that he intended "to assign the domain names and Element Arval trademark to Element Arval LLC," and that he "intended to offer to sell Element Arval LLC, including such intellectual property, to Element Financial Corp." Id.; see also (Doc. 10-9; 7/12/14 Clifton E-mail). Mr. Kaplan states that on July 11, 2014, Mr. Clifton observed:

> "It's at the margins . . . To the extent that they do intend

> to go to market as Element Arval, they are not going to be pleased to find out that the domain names have already been registered."
>
> "I would think that either Element or a competitor of Element would have an interest in these domains and it would absolutely be north of where I purchased them at. I mean, I wouldn't have done it otherwise. There was a profit motive in doing this."
>
> "It was absolutely clear that the strategic relationship with [Element] was important to Arval. No doubt about it."
>
> "The fact that I should be prohibited from profiting from my own ingenuity . . . that's just anti-American to me. Why should I give away potential monetary value for free?"

10/08/14 Kaplan Decl. ¶ 10. Mr. Clifton also told Mr. Kaplan that he formed Element Arval LLC "to hold all of these domain names . . . so that [he] could essentially just sell the equity interest in the Florida LLC, as opposed to having individual domain name purchase agreements for each and every domain.'" Id. ¶ 11.a. Additionally, Mr. Clifton said that he filed a Notice of Intent to Use the ELEMENT ARVAL trademark application as "a prophylactic measure because I don't want Element or Arval trying to file a trademark app and then coming after me and trying to essentially take away the domain names by arguing that I'm cybersquatting.'" Id. ¶ 11.b. Mr. Clifton contends that Mr. Kaplan's account of his statements "contain numerous misstatements and misquotes," though Mr. Clifton does not specify which statements he contests. 10/14/14 Clifton Decl. ¶ 5. Additionally, Mr. Clifton states that his wife had "no involvement with, or prior knowledge of" his actions with regard to registering the Domain Names, or any other actions taken with regard to the Element Arval LLC or the trademark application. 10/01/14 Clifton Decl. ¶ 23.

On July 14, 2014, PHH terminated Mr. Clifton's employment for breach of his employment obligations to PHH. 09/03/14 Kaplan Decl. ¶ 31; 10/01/14 Clifton Decl. ¶ 25. That same date, Mr. Clifton contacted James Halliday, President of PHH Fleet, then a subsidiary of Defendant Element representing Element's fleet management business, "and offered to sell "Element Arval LLC or its various intellectual property assets" to Element. 09/03/14 Kaplan Decl. ¶ 32; see also (Doc. 10-11; 07/14/14 Clifton E-mail); 10/01/14 Clifton Decl. ¶ 26 (E-mail to Mr. Halliday "to inquire as to [Element's] interest, if any, in engaging in negotiations to acquire Element Arval LLC or in-licensing any of Element Arval LLC's intellectual property"). Specifically, Mr. Clifton wrote:

> I am writing on behalf of, and in my capacity as sole managing member of, Element Arval LLC to determine whether Element Financial Corporation ("Element") might have any interest in acquiring Element Arval LLC or its various intellectual property assets. Such intellectual property includes, among other things, over 110 Internet domain names that may or may not be of interest to Element, including, without limitation, elementarval.com and element-arval.com. In this respect, I note that Section 4.10(a) of the Stock Purchase Agreement between Element and PHH Corporation requires Element to cease using the domain phharval.com within 6 months following the closing date of July 7, 2014.
>
> Please let me know if Element has any interest in engaging in negotiations for the purchase of Element Arval LLC or its assets by close of business this Friday, July 18th.

(Doc. 10-11).

On July 18, 2014, PHH and Element jointly sent Mr. Clifton a cease and desist letter, referencing his and Mrs. Clifton's registration of the Domain Names, with the intention of assigning them to Element Arval LLC, and contending that these actions constituted trademark infringement and cybersquatting. 09/03/14 Kaplan Decl. ¶ 33; see

also (Doc. 10-12; 07/18/14 Cease and Desist Letter). The above-referenced "tweets" were sent by Element Arval LLC to Plaintiffs' competitors after the cease and desist letter. 09/03/14 Kaplan Decl. ¶ 34; (Doc. 10-10).

Element Arval LLC maintains an Internet website at the address www.elementarval.com. (Doc. 36-5; Smith Decl.). Initially, the website touted: "Attention Fleet Industry Participants! Intellectual Property Assets of Element Arval LLC Available for License or Sale . . . including over 110 Internet domain names." (Doc. 8-4). Thereafter, the elementarval.com site displayed the message "Under Construction." Smith Decl. ¶ 4; (Doc. 36-6); see also 10/14/14 Clifton Decl. ¶ 6. On October 8, 2014, the elementarval.com website stated the following:

> Founded in 2014, Element Arval LLC is a new entrant in the U.S. fleet vehicle management services industry that currently owns various intellectual property assets and that is actively developing its service offering. Element Arval LLC's mission is to bring increased competition to the oligopoly that characterizes the U.S. fleet vehicle management services industry. Element Arval LLC's vision is to become the most trusted partner in the U.S. fleet vehicle management services industry by providing white glove customer service and competitively priced bespoke solutions. We intend to achieve our vision by delivering the greatest value and highest customer and driver satisfaction in the industry! Email fleetmanagement@elementarval.com for further information.

(Doc. 36-6); Smith Decl. ¶ 3.

According to Jim Nikopoulos, Element Vice President and General Counsel, Mr. Clifton's "registration and use of over one-hundred domain names incorporating the ELEMENT and/or ARVAL marks ("the Domains") and use of the Domains without Element or Arval's consent has caused Element and Arval to lose control over their trademarks. This loss of control has cause reputational harm to Element and Arval, and

has resulted in a loss of goodwill in the marks of Element and Arval." 10/08/14 Nikopoulos Decl. ¶ 12.

## II. The Complaint

Plaintiffs Arval and Element filed the initial complaint in this case on August 29, 2014 (Doc. 1; Complaint), and a First Amended Complaint on September 3, 2014. (Doc. 8; Amended Complaint). Plaintiffs bring seven claims:

Count I: Violation of Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d);

Count II: Unfair Competition and Trademark Infringement, 15 U.S.C. § 1125(a);

Count III: Trademark Infringement, 15 U.S.C. § 1114;

Count IV: Unfair Competition (Florida Common Law);

Count V: Tortious Interference with Business Relations (Florida Common Law);

Count VI: Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq.;

Count VII Declaratory Judgment: Breach of Contract.

See Amended Complaint.

## III. Motion to Dismiss

On October 1, 2014, Defendants filed a Motion to Dismiss the Amended Complaint. Defendants urge various grounds for dismissal of the Amended Complaint. For purposes of this Order, the Court focuses upon those issues relevant to Count I of the Amended Complaint, alleging a violation of the ACPA.

### A. Standing

Defendants contend that Element lacks standing to sue the Defendants because

Element "has no right, interest, or ownership in the Element, Arval, or Element Arval marks." Motion to Dismiss at 7-8. Defendants argue that Element "does not have a valid trademark because there is no application even pending with the [USPTO] filed by [Element] which includes the word Element." Id. at 8. Defendants also argue that Element has no standing related to the ARVAL mark. Id. at 9. Additionally, Defendants contend that Element is unable to show an injury in fact. Id. at 8. Plaintiffs respond that they have adequately pleaded Element's interest in the ELEMENT, ARVAL, and ELEMENT ARVAL marks. Response to Motion to Dismiss at 6-7 (citing Amended Complaint ¶ 20). Additionally, Plaintiffs argue that the Amended Complaint alleges that Element and Arval created a strategic alliance for global fleet management and vehicle leasing that included the use of the ELEMENT ARVAL mark and that, in accordance with the alliance, Element has the exclusive right to use the ELEMENT ARVAL and ARVAL marks in the United States. Id. at 7 (citing Amended Complaint ¶¶ 30-31).

Because courts cannot hear cases that fall outside of the limited jurisdiction granted to them, see e.g., Kirkland v. Midland Mortg. Co., 243 F.3d 1277, 1279-1280 (11th Cir. 2001); Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994), the Court must address the question of jurisdiction raised in Defendants' Motion to Dismiss, before addressing Plaintiffs' Motion for Preliminary Injunction. Defendants challenge Element's standing to pursue relief based on the ARVAL, ELEMENT, and ARVAL ELEMENT marks or a combination thereof.

Standing is a "'threshold jurisdictional question'" that must be addressed and satisfied at each stage of the litigation. See Fla. Family Policy Council v. Freeman, 561 F.3d 1246, 1253 (11th Cir. 2009) (quoting Elend v. Basham, 471 F.3d 1199, 1204 (11th

Cir. 2006)). Article III of the United States Constitution permits the court to hear only "Cases" and "Controversies." U.S. Const. art. III, § 2; see Warth v. Seldin, 422 U.S. 490, 498 (1975). The doctrine of standing implicates whether a dispute is a case or controversy that can be "appropriately resolved through the judicial process." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal marks and citation omitted). Article III standing has three elements: (1) injury in fact to "a legally protected interest" that is "'(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;'" (2) "'a causal connection between the injury and the conduct complained of'" that is fairly traceable to the defendant's action; and (3) a likelihood that the injury will be redressed by a favorable decision. Fla. Family Policy Council, 561 F.3d at 1253 (quoting Lujan, 504 U.S. at 560-61). See e.g. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc., 528 U.S. 167, 180-81 (2000); CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006). Standing "'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof,'" that is "'with the manner and degree of evidence required at the successive stages of the litigation.'" CAMP, 451 F.3d at 1269 (quoting Lujan, 504 U.S. at 561). Where "standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." Bischoff v. Osceola Cnty., 222 F.3d 874, 878 (11th Cir. 2000).[4] The relevant question is whether the plaintiff

---

[4] A motion to dismiss for lack of standing under Rule 12(b)(1) presents a question of law, and "facts outside of the pleadings may be considered as part of that determination." Goodman ex rel. Goodman v. Sipos, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001). Thus, even at the pleading stage, the Court can examine the record as a whole to determine whether there is subject matter jurisdiction and accept the undisputed facts in the record as true. See Elend, 471 F.3d at 1208; see also Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990).

has sufficiently alleged a personal stake in the outcome. Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008); Muhall v. UNITE HERE Local 355, 618 F.3d 1279, 1286 (11th Cir. 2010).

Element has pleaded, and the record supports at this stage of the proceedings, that Element has a legally protected interest in the marks ELEMENT and ARVAL and the combinations of the ELEMENT ARVAL marks. Plaintiffs allege that Arval has licensed use of its ARVAL mark to Element for use in the United States. Amended Complaint ¶ 2.b Additionally, Plaintiffs allege that "Element is the exclusive owner of all rights, title and interest in the trademark ELEMENT, as used in connection with financial services, fleet management and leasing services." Id. ¶ 20. Plaintiffs allege that Arval granted PHH the right to use the Arval mark in 2000, in connection with the PHH Arval fleet management alliance, id. ¶ 25, and that on June 2, 2014, Element and PHH entered into a Stock Purchase Agreement in which PHH agreed to sell its vehicle leasing and fleet management business, including its interest in the PHH Arval strategic alliance (with the license to use Arval's mark) to certain of Element's wholly owned subsidiaries for $1.4 billion. Id. ¶ 28. Thereafter,

> 30. Element and Arval entered into negotiations to form a strategic partnership and create global fleet management and vehicle leasing alliance between Element and Arval, including use of the mark ELEMENT ARVAL, a combination of the two companies' trademarks (the "Element Arval Alliance").
>
> 31. As part of the Element Arval Alliance, Element has the exclusive right to use the marks ELEMENT ARVAL and ARVAL in the United States in connection with vehicle leasing and fleet services.

Amended Complaint ¶ 30, 31; see also id. ¶ 60 ("Plaintiffs individually and collectively

own all right, title and interest in the marks ARVAL, ELEMENT and ELEMENT ARVAL."). Moreover, nothing in the record in this case, developed in connection with the pending Motion for Preliminary Injunction, negates Element's protected interest in the marks ELEMENT, ARVAL, and ELEMENT ARVAL or similar combinations, in connection with vehicle leasing and financing in the United States. See 08/27/14 Nikopoulos Decl. ¶¶ 7-13, 16, 17; Noubel Decl. ¶¶ 13,14. Though the Element Arval Alliance Agreement is between Arval and Element Vehicle Financial Services, LLC ("EVFS LLC"), the Agreement provides that EVFS LLC and its "affiliates," which includes any "person" "directly or indirectly controlling, controlled by, or under common control" may operate in the United States territory, under the Alliance. As such, Plaintiff Element is included in the Alliance net.

The fact that Element does not possess a registered trademark or has not applied for one is not dispositive of whether Element has a protected interest in the disputed marks. The federal Lanham Act offers trademark protection for unregistered common law marks. "Common-law trademark rights are appropriated only through actual prior use in commerce." Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1321 (11th Cir. 2011) (internal quotation marks and citations omitted). To recover under the Lanham Act based upon an unregistered trademark,"'[t]he use of a mark in commerce . . . must be sufficient to establish ownership rights for a plaintiff to recover against subsequent users . . . .'" Crystal Entm't, 643 F.3d at 1321 (citation omitted) (emphasis omitted). For example, 15 U.S.C. § 1125(a) protects qualifying unregistered marks (common law trademarks)

> [w]here the alleged unregistered trademarks used by the

> plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source . . . . [O]nly those marks that are capable of distinguishing the owner's goods from those of others, i.e., that are sufficiently "distinctive," are eligible for federal registration or protection as common law marks under the Lanham Act.

Sound Surgical Tech., LLC v. Leonard A. Rubinstein, M.D., P.A., 734 F. Supp.2d 1262, 1278 n.12 (M.D. Fla. 2010) (internal quotation marks and citations omitted); see also Crystal Entm't, 643 F.3d at 1320 (use of another's unregistered common law trademark can constitute a violation of 15 U.S.C. § 1125(a)). Likewise, the ACPA does not require that the mark be registered. The ACPA provides that "[a] person shall be liable in a civil action by the owner of a mark." 15 U.S.C. § 1125(d)(1)(A). Thus, a claimant is not required to first file a trademark application with the USPTO, or obtain a registration, before bringing suit under the ACPA, but rather may bring suit if the unregistered mark is "distinctive" or "famous." See Office of Strategic Servs., Inc. v. Sadegian, 528 F.App'x 336, 345 (4th Cir. 2013) (The ACPA obligates a plaintiff to show ownership of a valid protectable trademark); Bravaro Palace S.A. v. Vacation Tours, Inc., 203 F. App'x 252, 256 (11th Cir. 2006) (protected mark must be famous or distinctive); DaimlerChrysler v. The Net, Inc., 388 F.3d 201, 204 (6th Cir. 2004) ("a trademark need not be registered to be entitled to protection under the ACPA"); K.S.R. X-Ray Supplies, Inc. v. Se. X-Ray, Inc., No. 09-81454-CIV, 2010 WL 4317026, at *5 (S.D. Fla. Oct. 25, 2010) (although the mark at issue is not registered, plaintiff has continually used the mark since 1988 to identfy and promote the products it sells); 15 U.S.C. § 1125(d)(1)(A) and (A)(ii).

Here, Plaintiffs allege that Arval is the owner of the registered ARVAL mark, which has been in use in the United States since at least 2000 and is distinctive in the vehicle

leasing and fleet management business. Amended Complaint ¶¶15-19. Additionally, Plaintiffs allege that Element is the exclusive owner of rights and interest in the mark ELEMENT, and which has been in use since August 2011, which is well-recognized in the vehicle and equipment financing sector. Id. ¶¶ 20-24. As set forth above, Plaintiffs have alleged that Element has a license to use the ARVAL mark in the United States, and, in conjunction with the Element Arval Alliance Agreement, has the right to use the ARVAL and ELEMENT marks and combinations thereof in the United States. Again, nothing in the developed record undercuts these allegations. See 08/27/14 Nikopoulos Decl. ¶¶16, 17; 09/03/14 Noubel Decl. ¶¶ 13,14.

Moreover, the Court concludes that Element has alleged an injury in fact, alleging that Defendants' encumbrance of the Domain Names has disrupted and delayed the Element Arval Alliance Agreement; caused Plaintiffs to lose control over their trademarks, reputation and goodwill; obstructed Plaintiffs' (including Element's) business goals; caused strain on Arval's and Element's business relationship; and caused financial harm. Amended Complaint ¶¶ 51-53, 66, 67; 08/27/14 Nikopoulos Decl. ¶¶ 19-21; 10/08/14 Nikopoulos Decl. ¶¶ 10, 12. A favorable decision would likely redress the enumerated injuries. Element has sufficiently alleged a protected interest in the ELEMENT, ARVAL, and ELEMENT ARVAL marks, and an injury to this protected interest that is likely redressible by a favorable decision. Thus, Element has standing to pursue an ACPA claim against Defendants.

**B. Failure to State a Claim of Violation of the ACPA**

Defendants contend in their Motion to Dismiss that because Plaintiffs do not have a valid trademark entitled to protection in the ELEMENT or ELEMENT ARVAL marks,

they are unable to state a cause of action for cybersquatting under the ACPA. Motion to Dismiss at 9. Additionally, Defendants argue that it is unclear which Plaintiff is alleged to own which mark; "[i]f one mark is owned individually by one Plaintiff, then the other Plaintiff has no standing to sue Defendants for Cybersquatting in regard to that mark." Id. at 9-10. Additionally, Defendants contend that the ACPA "requires Plaintiffs to prove that Defendants registered the marks at issue," and argue that the Amended Complaint is "confusing" and "contradictory" on this point. Id. at 10. Plaintiffs respond that they have pleaded that Element has a common law right to the ELEMENT mark and that Plaintiffs jointly hold rights to the mark ELEMENT ARVAL, which it argues is sufficient to bring a claim under the ACPA. Response to Motion to Dismiss at 9-10 (citing (Amended Complaint ¶¶ 20, 30, 31). Moreover, Plaintiffs assert that the Amended Complaint sufficiently alleges the Plaintiffs' ownership interests in the ELEMENT, ARVAL, and ELEMENT ARVAL marks. Id. at 10 (citing Amended Complaint ¶¶ 16, 20, 30). Finally, Plaintiffs argue that the Amended Complaint alleges that both Defendants J. Christopher Clifton and Bonnie Clifton or someone using her account, registered one or more of the allegedly infringing Domain Names, id. at 10 (citing Amended Complaint ¶¶ 39, 40), and that Mr. Clifton formed a shell company, Element Arval LLC, in furtherance of Defendants' "plan to ransom the domains." Id. at 10-11 (citing Amended Complaint ¶ 47).

Rule 8(a)(2) provides that a claimant must plead "a short and plain statement of the claim." When ruling on a motion to dismiss for failure to state a claim, see Fed. R. Civ. P. 12(b)(6), the Court takes the facts alleged in the complaint as true and construes them in the light mst favorable to the plaintiff. See Harris v. United Auto. Ins. Grp., Inc., 57 F.3d 1277, 1230 (11th Cir. 2009). The Rule 12(b)(6) analysis "is limited primarily to

the face of the complaint and attachments thereto." Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1368-69 (11th Cir. 1997). The motion will be denied if the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombley, 550 U.S. 544, 555 (2007)).

The Anticybersquatting Consumer Protection Act provides that:

> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>
> (i) has a bad faith intent to profit from that mark . . .; and
>
> (ii) registers, traffics in, or uses a domain name that
>
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; . . . .

15 U.S.C. § 1125(d)(1). Thus, a trademark owner asserting a claim under the ACPA must establish the following: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. DaimlerChrysler, 388 F.3d at 204; Sound Surgical Tech., 734 F. Supp.2d at 1275. The ACPA provides for injunctive relief, 15 U.S.C. § 1116(a), and the recovery of actual

damages. 15 U.S.C. § 1117(a).

As set forth above, a claimant is not required to first file a trademark application with the USPTO, or obtain a registration, before bringing suit under the ACPA. See Sadegian, 528 F.App'x at 345; DaimlerChrysler 388 F.3d at 204; K.S.R. X-Ray Supplies, 2010 WL 4317026, at *5; 15 U.S.C. § 1125(d)(1)(A) and (A)(ii). Plaintiffs have sufficiently alleged that both Arval and Element are entitled to ACPA protection as to the ARVAL and ELEMENT marks and the combination thereof. See Amended Complaint ¶¶ 2, 6, 15-31, 60.

As to the second element of a ACPA claim, Plaintiffs have sufficiently alleged that the marks are distinctive, either as registered trademarks, or through prior use in commerce. Amended Complaint ¶16-19, 20-24, 26, 61. Additionally, there is no dispute that the Amended Complaint alleges that the Defendants' disputed Domain Names are identical or confusingly similar to Plaintiffs' ARVAL and ELEMENT marks, incorporating the exact names, either together or in association with vehicle fleet management or financing services terms. See Amended Complaint ¶¶ 39, 63. And, though Defendants argue that the Amended Complaint is "confusing" with regard to which Defendant actually registered the Domain Names, the Amended Complaint in actuality sufficiently alleges that each Defendant was indeed involved in "registering," "trafficking," or "using" the ELEMENT and ARVAL marks. See 15 U.S.C. § 1125(d)(1)(A)(ii). The Amended Complaint alleges that both Mr. and Mrs. Clifton registered the allegedly infringing Domain Names, that the Domain Names were transferred to Element Arval LLC, Amended Complaint ¶¶ 39, 40, 44, 47, 55; (Doc 8-3 (Element Arval LLC owns "various intellectual property assets" including "over 110 Internet domain names.")), and that Mr.

Clifton and Element Arval LLC attempted to sell the Domain Names. Amended Complaint ¶¶ 42, 44, 55, 56, 58, 64, 65. At this stage of the proceedings, Defendants are all properly named in Plaintiffs' Count I anticybersquatting claim brought pursuant to the ACPA.

Finally, the Amended Complaint sufficiently alleges that Defendants, through their conduct, evinced a "bad faith intent to profit" from their use of Plaintiffs' marks, by registering the Domain Names containing the marks on the eve of a business deal joining Arval and Element as partners in a joint alliance, attempting to sell the Domain Names to Element and to third parties in the fleet management business, and using the Domain Names containing Plaintiffs' marks to divert Plaintiffs' customers to competitors. Amended Complaint ¶¶ 36-51, 53, 55, 56, 58, 64, 65. As such, the well-pleaded allegations of Count I of the Amended Complaint demonstrate Plaintiffs' marks are distinctive, that the infringing Domain Names are confusingly similar, and that the Defendants registered the Domain Names with the bad-faith intent to profit from them, stating a plausible claim against Defendants for a violation of the ACPA. See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1307 (11th Cir. 2009).

### C. Pleading Deficiencies

Defendants argue that the Amended Complaint should be dismissed because it is a "shotgun" pleading, fails to follow the pleading requirements of Rules 8 and 10, Federal Rules of Civil Procedure by not sorting out which claim relates to which particular Plaintiff or Defendant, and is confusing and "contradictory." Motion to Dismiss at 2-7. The typical shotgun pleading is one that "contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the

counts (i.e. all but the first) contain irrelevant factual allegations and legal conclusions." Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 (11th Cir. 2002). A shotgun pleading is one that makes it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." Anderson v. Dist. Bd. of Tr. of Cent. Fla. Cmty. Coll., 77 F.3d 364, 366 (11th Cir. 1996). Consequently, in ruling on the sufficiency of a claim, the Court is faced with the onerous task of sifting out irrelevancies in order to decide for itself which facts are relevant to a particular cause of action asserted. See Strategic Income Fund, 305 F.3d at 1295. The term also refers to pleadings that are "replete with factual allegations and legal conclusions." Osahar v. U.S. Postal Serv., 297 F. App'x 863, 864 (11th Cir. 2008). The Amended Complaint is not a "shotgun" pleading. It contains seven counts incorporating only the facts alleged, and not the allegations of the preceding counts. Given the nature of Plaintiffs' claims, they are bound to share factual overlap, such that the general factual allegations would likely be re-alleged in support of Plaintiffs' claims. Defendants exhibited no confusion or difficulty responding to the Amended Complaint with a Motion to Dismiss, and addressing the arguments presented in conjunction with the Motion for Preliminary Injunction. Likewise, the Court has had no difficulty discerning Plaintiffs' claims against Defendants. The Amended Complaint provides Defendants with fair notice of the claims brought against each Defendant and the basis therefor.

Moreover, Rule 8 requires only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Rule directs that "[e]ach allegation must be simple, concise and direct." Fed. R. Civ. P. 8(d)(1). Rule 10(b) provides, in pertinent part:

> If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count . . . .

Fed. R. Civ. P. 10(b). The Eleventh Circuit has explained that Rule 10(b) requires "that discrete claims should be pled in separate counts." Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001); see also Anderson, 77 F.3d at 366 (a properly drawn complaint "will present each claim for relief in a separate count, as required by Rule 10(b)"). Additionally, the Eleventh Circuit has explained that Rules 8 and 10 work together

> to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

Fikes v. City of Daphne, 79 F.3d 1079, 1082 (11th Cir. 1996) (quotation marks and citation omitted). However, "[s]eparation, under [Rule] 10(b), is discretionary and unnecessary if the claims arise from the same actions or underlying circumstances." Capital Factors, Inc. v. Heller Fin., Inc., 712 F. Supp. 908, 911 (S.D. Fla. 1989) (citation omitted).

The Amended Complaint complies with Rules 8 and 10. Plaintiffs have pleaded each theory of relief in a separate count. Defendants argue that Plaintiffs have improperly named all Plaintiffs and all Defendants in each count, rather than separating them out. As it is developed, the evidence may demonstrate that each claim does not apply to all Plaintiffs and Defendants. However, Plaintiffs have alleged that each of these claims apply to all Plaintiffs and all Defendants, and in ruling on a motion to dismiss, the Court accepts the factual allegations set forth in the complaint as true. Further, requiring

Plaintiffs to plead a separate claim for each Plaintiff and each Defendant relating to each of the claims brought, as Defendants suggest, would not serve Rule 10(b)'s purpose of "promot[ing] clarity." Fed. R. Civ. P. 10(b). Rather, such a requirement would produce a muddled and unnecessarily redundant complaint. The Court declines to require separation of the claims relating to each Plaintiff and each Defendant. See Capital Factors, 712 F. Supp. 2d at 911.

Accordingly, Dependants' Motion to Dismiss based upon alleged pleading deficiencies is due to be denied.

## V. Motion for Preliminary Injunction

The Court is authorized to enter a preliminary injunction by Rule 65, Federal Rules of Civil Procedure. To prevail on their request for injunctive relief, Plaintiffs must demonstrate: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1246-47 (11th Cir. 2002). A preliminary injunction is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements. America's Health Ins. Plans v. Hudgens, 742 F.3d 1319, 1329 (11th Cir. 2014). "The purpose of the preliminary injunction is to preserve the positions of the parties as best we can until a trial on the merits may be held." Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011). "The burden of persuasion on all of the four requirements is at all times upon the plaintiff." Canal Auth. of Fla. v. Callaway, 489 F.2d

567, 573 (5th Cir. 1974).[5] In considering a motion for preliminary injunctive relief, "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) (internal quotation marks and citation omitted).

Because the Court determines that Plaintiffs are entitled to a preliminary injunction based upon the anticybersquatting ACPA claim (Count I), the Court need not address the remaining claims at this time.

**A. Substantial Likelihood of Success on the Merits**

The ACPA was passed by Congress in 1999, as an amendment to the Lanham Act. Sound Surgical Tech., LLC, 734 F. Supp. 2d at 1275. "Cybersquatting 'occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder.'" Id. (quoting DaimlerChrysler, 388 F.3d at 204).

As set forth above, Plaintiffs are not required to have registered a trademark in order to assert a ACPA claim seeking protection of that mark. E.g. DaimlerChrysler, 388 F.3d at 204; K.S.R. X-Ray Supplies, 2010 WL 4317026, at *5. Plaintiffs are likely to succeed in establishing that they each have a valid trademark in both ARVAL and

[5] In Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

ELEMENT and the combination of the two, which is entitled to protection. Arval's registered trademark has been used in the vehicle leasing and management services industry in the United States since at least 2000. Noubel Dec. ¶¶ 6-8, 10-12; 09/03/14 Kaplan Decl. ¶¶ 7, 8; (Doc. 10-3 at 2). Registration of a trademark establishes a rebuttable presumption that the mark is distinctive. Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1357 n.3 (11th Cir. 2007) (citing 15 U.S.C. § 1057(b)). Defendants have proffered no evidence to rebut the presumption that Arval's Mark, ARVAL, is distinctive. Likewise, Element has conducted substantial and well-publicized business in the United States since 2010, including through its website www.elementcorp.com, and has established itself in the field of equipment finance and fleet rental financing and leasing, using its brand ELEMENT. 08/27/14 Nikopoulos Decl. ¶ 7-13; 10/08/14 Nikopoulos Decl. ¶¶ 6, 7, 8. The ELEMENT mark is a "source identifier of Element's business and has been used in such capacity" throughout North America since 2007. 08/27/14 Nikopoulos Decl. ¶ 8. Element has extensively advertised and publicized the ELEMENT mark in the vehicle and equipment financing sector throughout the United States, such that it is well-recognized. Id. ¶¶ 10, 13. Considering this evidence, the Court determines that Element has a substantial likelihood of success in establishing that it possesses a protectable common law trademark in the mark ELEMENT. Finally, as part of the Element Arval Alliance Agreement, which was consummated after Element purchased PHHVMS vehicle management services, and its license to use the ARVAL mark, on June 2, 2014, Arval granted Element a license to use the ARVAL mark in connection with the joint vehicle financing and fleet management business in the United States. Noubel Decl. ¶ 14. Thus, Element has established that it has a protectable interest in the ARVAL mark, and

likewise, Arval has a protectable interest in the ELEMENT mark, based upon the Element Arval Alliance Agreement. See S-48.

Plaintiffs have demonstrated that they are likely to succeed in establishing that the marks ELEMENT, ARVAL, and the combination of the two are "distinctive." Trademark or service mark protection is available "to distinctive marks, that is, marks that serve the purpose of identifying the source of the goods or services.'" Knights Armament Co. v. Optical Sys. Tech., Inc., 654 F.3d 1179, 1188 (11th Cir. 2011). "In order to be entitled to the protections of the ACPA, a mark must be distinctive at the time of registration of the domain name." K.S.R. X-Ray Supplies, 2010 WL 4317026, at *4 (citing 15 U.S.C. § 1125(d)(1)(A)(ii)(II)). "The element of the anti-cybersquatting claim that the mark is distinctive or famous is similar to the consumer confusion factor in a trademark infringement context in that the plaintiff must show that the mark is either inherently distinctive or is a descriptive mark that has acquired a secondary meaning." Id. Applying this analysis, the Court observes that the marks ARVAL and ELEMENT are "arbitrary," that is, they bear no relationship to the product or service provided, here, vehicle fleet management and financing. As such, they are accorded the greatest strength or distinctiveness. See Knights Armament Co., 654 F.3d at 1188; Frehling Enter., Inc. v. Intl Select Grp., Inc., 192 F.3d 1330, 1335-36 (11th Cir. 1999); K.S.R. X-Ray Supplies, 2010 WL 4317026, at *5. Additionally, viewing the totality of the circumstances surrounding Plaintiffs' prior use of the ARVAL and ELEMENT marks, the undisputed evidence establishes that association and notice of the marks with Plaintiffs was present. The evidence establishes that each Plaintiff has built a considerable business in the vehicle fleet management and financing industry, using these marks. Plaintiffs have proven that

their prior use of the ARVAL and ELEMENT marks establishes ownership, in that the distribution of the marks was widespread and accessible on the Internet, and the marks were associated by members of the targeted public with Plaintiffs' businesses and services. See Crystal Entm't, 643 F.3d at 1321. Additionally, Defendants, through Mr. Clifton, were clearly on notice that the marks were used in connection with Arval's and Element's products, and indeed Mr. Clifton, through Element Arval LLC, has attempted to capitalize on that fact. Both Arval and Element have invested significant time and money to develop a strong reputation and goodwill associated with their names and marks in the leasing and fleet management and financing in the United States. Noubel Decl. ¶ 12; 08/27/14 Nikopoulos Decl. ¶¶ 10, 13. After Element's purchase of the PHHVMS fleet management interests in June 2014, Arval and Element created a global strategic alliance culminating in the Element Arval Alliance Agreement, "including the branding of the partnership under the mark ELEMENT ARVAL." Noubel Decl. ¶ 13.

Defendants' Domain Names are at minimum confusingly similar to Plaintiffs' distinctive marks. "'Courts generally have held that a domain name that incorporates a trademark is confusingly similar to that mark if consumers might think that [the domain name] is used, approved, or permitted by the mark holder.'" Sound Surgical Techs., 734 F. Supp. 2d at 1275 (quoting DaimlerChrysler, 388 F.3d at 205-206); see also K.S.R. X-Ray Supplies, 2010 WL 4317026, at *4; Victoria's Cyber Secret LTD P'ship v. Secret Catalogue, Inc., 161 F. Supp. 2d 1339, 1351 (S.D. Fla. 2001) ("The taking of an identical copy of another's famous and distinctive trademark for use as a domain name creates a presumption of confusion among Internet users as a matter of law."). "'[S]light differences between domain names and registered marks, such as the addition of minor

or generic words to the disputed domain names are irrelevant.'" Sound Surgical Techs., 734 F. Supp. 2d at 1275 (quoting DaimlerChrysler, 388 F.3d at 205-206); see also Victoria's Cyber Secret LTD P'ship, 161 F. Supp. 2d at 1347. Additionally, when evaluating whether a domain name is confusingly similar, the Court may disregard the "top-level" domain name (e.g. .com, .net, .org, etc.). Sound Surgical Techs., 734 F. Supp. 2d at 1275.[6] Here, Defendants' registered Domain Names all incorporate the ELEMENT mark, and some add the ARVAL mark, or other minor or generic words such as "financial," "fleet," or "vms, which actually further identify with Element and Arval and add to the confusion. (See Doc. 8-2). The Domain Names are directed to those in the fleet management and finance industry who obviously intend to link with Element or Arval or the Element Arval Alliance, when they click on the site. Instead, they are directed to Element and Arval's and the Alliance's competitors, or to the Element Arval LLC website, which has also set itself up as a competitor. Alternatively, Defendants, through Element Arval LLC hope to sell the Domain Names to those in the industry. The whole purpose of

---

[6] The Eleventh Circuit has recognized seven factors to consider when determining whether there is a likelihood of confusion: (1) the strength of the plaintiff's mark, (2) the similarity of the mark, (3) the similarity of the services or products offered by the plaintiff and defendant, (4) the similarity of the parties' retail outlets and consumers, (5) the similarity of advertising media and methods, (6) the defendant's intent, and (7) actual confusion. Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1239 (11th Cir. 2008); Conagra, Inc. v. Singleton, 743 F.2d 1508, 1514 (11th Cir. 1984). The strength of the mark and the evidence of actual confusion are the most important factors. HBP, Inc. v. Am. Marine Holdings, Inc., 290 F. Supp. 2d 1320, 1327 (M.D. Fla. 2003), aff'd, 129 F. App'x 601 (11th Cir. 2005). Evaluating the factors as a whole, the Court observes that Defendants are now using Plaintiffs' distinctive marks to offer similar services over the Internet directed to those in the fleet management services industry, with an intent to co-opt Plaintiffs' customers. Though Plaintiffs have not at this early stage of the case, adduced evidence of "actual confusion," it would require a "'quantum leap of imagination' to believe that a user of the internet accessing" the Domain Names would not confuse it with Arval and Element's businesses in the vehicle fleet management and financing industry. See DC Comics v. G5 Barbers, LLC, No. 6;11-cv-1600-Orl-36GJK, 2012 WL 4328610, at *6 (M.D. Fla. Aug. 22, 2012) (citing Victoria's Cyber Secret LTD P'ship, 161 F. Supp. 2d at 1347 (finding that an internet user would likely associate the domain names at issue with Victoria's Secret, a famous trademark)), adopted N. 6:11-CV-1600-Orl-36GJK, 2012 WL 4336028 (M.D. Fla. Sept. 20, 2012). Thus, an evaluation of the factors weighs in favor of a finding that the Domain Names are confusingly similar to Plaintiffs' marks.

the Domain Names is to create confusion undercutting Plaintiffs' business; the Court finds that they are confusingly similar.

The evidence in the record at this stage of the proceedings also supports the conclusion that all three Defendants registered, trafficked or used the Domain Names. See 15 U.S.C. § 1125(d)(1)(A)(ii). While Mr. Clifton contends that his wife had no involvement in the trademark registration, 10/01/14 Clifton Decl. ¶ 23, the record as it stands today establishes that at one point, the allegedly infringing Domain Names were registered to an account owned by all three Defendants, including Mrs. Clifton. 09/03/14 Kaplan Decl. ¶¶ 21, 23, 24; 10/01/14 Clifton Decl. ¶¶ 17, 19, 22, 23. Mr. Clifton began to purchase and register Domain Names on June 30, 2014. 09/03/14 Kaplan Decl. ¶ 21; 10/01/14 Clifton Decl. ¶ 17. On July 7, 2014, Mr. Clifton stated that he had registered Domain Names using his wife's account. 10/08/14 Kaplan Decl. ¶ 7. "Defendants" began to purchase additional websites beginning July 8, 2014. 09/03/14 Kaplan Decl. ¶ 23. On July 8, 2014, Mr. Clifton created a new registration account and "transferred the initial domain names to the New Account and then registered additional domain names using the New Account." 10/01/14 Clifton Decl. ¶ 19. On July 10, 2014, Mr. Clifton formed Element Arval LLC, 09/03/14 Kaplan Decl. ¶ 27; 10/08/14 Kaplan Decl. ¶ 11; 10/01/14 Clifton Decl. ¶ 21. On July 11, 2014, Mr. Clifton transferred all of the Domain Names then held in the New Account to Element Arval, LLC, 10/01/14 Clifton Decl. ¶ 22. On July 14, 2014, Mr. Clifton offered to sell "Element Arval LLC or its various intellectual property assets" to Element. 09/03/14 Kaplan Decl. ¶ 32; 10/01/14 Clifton Decl. ¶ 26; (Doc. 10-11). And Mr. Clifton created the Element Arval LLC website by August 26, 2014, to advertise and sell the Domain Names. 09/03/14 Kaplan Decl. ¶ 25; (Doc. 10-6).

While the facts may develop that Mrs. Clifton has not participated in the use of the Domain Names, Plaintiffs have demonstrated a likelihood of success as to her involvement in registering the Domain Names such that Mrs. Clifton, as well as Mr. Clifton and Element Arval LLC should be enjoined from further use of Plaintiffs' marks. Additionally, Mr. Clifton, and Element Arval LLC, "trafficked" the Domain Names when they offered to sell them to Element or to third parties in the fleet management industry. See Ford Motor Co. v. Catalanotte, 342 F.3d 543, 548 (6th Cir. 2003); KB Home v. Smith, No. 8:13-cv-2644-T-27EAJ, 2014 WL 1946622, at *4 (M.D. Fla. May 14, 2014) ("An offer to sell a domain name may be sufficient to evidence trafficking.").

In determining whether Plaintiffs are likely to prevail as to the fifth element of the cybersqatting claim, "bad faith intent to profit," the ACPA provides a list of nine non-exclusive factors that a court may consider in determining whether a person accused of cybersquatting had a "bad faith intent to profit." See 15 U.S.C. § 1125(d)(1)(B)(i).[7] A bad

---

[7] The nine "bad faith intent to profit factors" are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bonafide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the

(continued...)

faith intent to profit from a domain name "can arise either at the time of registration or at any time afterwards." Sound Surgical Techs., 734 F. Supp. 2d at 1277. However, a "bad faith intent to profit" may not be found "in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii); Sound Surgical Techs., 734 F. Supp. 2d at 1276.

"The practice of holding domain names for ransom with an intent to profit directly from selling the domain name itself is the 'paradigmatic harm' targeted by the act." S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1246 (11th Cir. 2009); see also Utah

---

[7](...continued)

source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous [as defined by the statute].

15 U.S.C. § 1125(d)((1)(B)(i)(I)-(IX).; see also Pensacola Motor Sales, Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1221 (11th Cir. 2012).

Lighthouse Ministry v. Found. for Apologetic Info., 527 F.3d 1045, 1058 (10th Cir. 2008) ("The quintessential example of bad faith intent to profit is when a defendant purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price."). "'[A] defendant could also intend to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's.'" S. Grouts & Mortars, Inc., 575 F.3d at 1247 (quoting Utah Lighthouse Ministry, 527 F.3d at 1058). Both of these quintessential indicia are present here. Though Mr. Clifton had not yet named his price, Plaintiffs have established that he inquired into selling the intellectual property to Element, and that he intended to make a profit doing so. 10/01/14 Clifton Decl. ¶¶ 24, 26; 09/03/14 Kaplan Decl. ¶¶ 29, 32: (Docs. 10-9 and 10-11); 10/08/14 Kaplan Decl. ¶ 10. Thereafter, Element Arval LLC attempted to sell the Domain Names to third party "Fleet Industry Participants." (Doc. 8-4). Additionally, Mr. Clifton stated that he had set the Domain Names to redirect hits to PHH's and Arval competitors in the fleet business. 09/03/14 Kaplan Decl. ¶ 26; 10/08/14 Kaplan Decl. ¶ 8. Indeed, the Element Arval LLC website evinces a bad faith intent to profit, first offering to license or sell "over 110 Internet domain names," it's only asset, (Doc. 8-4), and later offering services with a "mission . . . to bring increased competition to the oligopoly that characterizes the U.S. fleet management services industry." (Doc. 36-6). See 15 U.S.C. § 1125(d)(1)(B)(i)(V)-(VI).

The remaining factors are also present in this case. It is undisputed that Defendants knowingly registered multiple domain names which are identical or confusingly similar to the ARVAL and ELEMENT marks individually, or in combination;

that the ARVAL and ELEMENT marks are distinctive; and that at the time of their registration, the subject Domain Names did not include any of the Defendants' trademarks or intellectual property, or the legal name of Mr. or Mrs. Clifton. Mr. Clifton created Element Arval LLC after registering the Element/Arval Domain Names, e.g. 10/01/14 Clifton Decl. ¶¶ 21, 22, and the Domain Names had never been used before by Defendants "in connection with the bonafide offering of any goods or services." See 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(III), (VIII). Nor are Defendants using or proposing to engage in noncommercial or "fair use" of the ARVAL and ELEMENT marks. Id. § (IV).

The Court finds the facts that Mr. Clifton, an attorney, researched the law pertaining to the ACPA, and concluded that his conduct did not constitute illegal cybersquatting under the statute; that Element had not registered its trademark; and that the ELEMENT ARVAL mark "did not appear to have yet been used in commerce in the U.S. in the vehicle fleet management services industry," see 10/01/14 Clifton Dec. ¶ 20, do not negate the fact of Defendants' bad faith intent to profit. Indeed, Mr. Clifton and Element Arval LLC continued to use and traffic in the Domain Names even after receiving Plaintiffs' cease and desist letter setting forth their anticybersquatting claim. To qualify for the ACPA "safe harbor" defense, Mr. Clifton "must have had both a subjective belief and an objectively reasonable belief in the lawfulness of [his] actions." Pensacola Motor Sales, Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1226 (11th Cir. 2012). A cybersquatter "cannot simply deny that it had any bad faith intent, since doing so would allow any cybersquatter to use the safe harbor provision to frustrate Congress' purpose by artificially limiting the statute's reach." Victoria's Cyber Secret LTD P'ship, 161 F. Supp. 2d at 1353. Given the evidence and the totality of the circumstances of this case

when aligned with the statutory "bad faith intent to profit" factors, the Court concludes that Mr. Clifton's belief that the use of the disputed Domain Names was "fair use or otherwise lawful" was unreasonable. 15 U.S.C. § 1125(d)(1)(B)(ii).

Although discovery may uncover additional evidence relevant to some of the factors, the record before the Court at this time, considering the statutory factors in their entirety, establishes that Defendants registered more than 100 Domain Names and created the www.elementarval.com website with a bad faith intent to profit.

**B. Irreparable Injury**

"[T]he asserted irreparable harm 'must be neither remote nor speculative, but actual and imminent.'" Seigel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). The Court finds that Plaintiffs have shown a substantial threat to consumer and industry confusion, resulting in actual and imminent irreparable harm to their reputation and goodwill represented by the marks.[8] "The gravity of injury to Plaintiffs is further enhanced because '[Defendants' counterfeit] marks appear[ ] on the Internet, thereby reaching a substantial number of customers.'" Dell, Inc. v. BelguimDomains, LLC, No. 07-22674-CIV, 2007 WL 6862342, at *12 (S.D. Fla. Nov. 21, 2007) (citation omitted). By his own admission, Mr. Clifton has set the Domain Names to redirect those accessing them to Plaintiffs' competitors. 09/03/14 Kaplan Decl. ¶ 26; 10/08/14 Kaplan Decl. ¶ 8. As such, Plaintiffs are harmed every day that their customers are diverted to Defendants'

[8] The Court does not presume that Plaintiffs suffered irreparable injury based on Plaintiffs' likelihood of success on their ACPA claim. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 393-94 (2006); 15 U.S.C. § 1116(a). The Eleventh Circuit, to date, has not explicitly extended the Supreme Court's decision in eBay, which addressed a patent claim, to actions for trademark infringement, though it did observe that "a strong case can be made" for doing so. N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1228 (11th Cir. 2008); see also Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1320 (11th Cir. 2010);

website or to competitors, through the disputed Domain Names. Moreover, Defendant Element Arval LLC is now attempting to compete directly with Plaintiffs in the fleet management business, as is evidenced by the company's recent October 8, 2014 website. (See Doc. 36-6). Based on the size of the Arval and Element businesses, it is clear that Plaintiffs have developed substantial goodwill in the vehicle fleet services industry that would be undermined if Defendants are not prohibited from using, advertising, soliciting and promoting Element Arval LLC and the more than 100 Domain Names containing Plaintiffs' marks. Defendants' continued actions are likely to lead to confusion caused by the Domain Names and Element Arval LLC which incorporate Plaintiffs' trademarks. Thus, Plaintiffs have established irreparable injury, and that monetary damages alone are inadequate to compensate for the injury.

### C. The Threatened Injury to Plaintiffs Outweighs the Potential Harm to Defendants

Injunctive relief does not impose a major threat of harm to Defendants other than, at minimum, delay their ability to use Plaintiffs' names in the creation of their competitive business or sale of the very Domain Names at issue in this case. Defendants have demonstrated no ongoing business, or risk of loss of assets or customers to that business, and the record does not establish that a preliminary injunction will cause any hardship to any employees. Indeed, Defendants do not argue that an injunction would impose a major threat of harm on them. Although Element Arval LLC's commercial use of the disputed Domain Names appears to have shifted from attempting outright sale of the Domain Names to third parties, to the creation of a competing business, this change occurred after Plaintiffs' cease and desist letter, and any harm to Defendants' evolving

business would have been incurred after Defendants were on notice that Plaintiffs were pursuing an anticybersquatting claim. Nothing in the preliminary injunction to issue will prevent Defendants from registering non-infringing domain names and websites, and continuing their business in that capacity. See Dell, Inc., 2007 WL 6862342, at *13. In short, the only harm to Defendants as a result of a preliminary injunction would be a temporary preclusion from using names that infringe upon Plaintiffs' marks. Moreover, "'[a]ny harm suffered by defendants was brought about by their own actions . . . . Defendants' self-inflicted harm is far outweighed by the immeasurable damage done [to the Plaintiffs] by the infringement of [their] Marks. Defendants simply have no equitable standing to complain of injury should their infringement be preliminarily enjoined.'" Dell, Inc., 2007 WL 6862342, at *12 (quoting Burger King Corp. v. Majeed, 805 F. Supp. 994, 1006 (S.D. Fla. 1992)). Indeed, Defendants' intentional cybersquatting of Plaintiffs' marks "carried with it a clear risk of an injunction and damages." Dell, Inc., 2007 WL 6862342, at *13.

The cost to Defendants to change the name of its business and Domain Names, or pause, while this lawsuit proceeds to its conclusion, is minimal when compared to Plaintiffs' irreparable harm. Plaintiffs have established that they stand to lose customers, goodwill and reputation by Defendants' continued use of their marks.

### D. Public Interest

An injunction will not be adverse to the public interest. Indeed, an injunction furthers the public interest by recognizing and protecting Plaintiffs' intellectual property rights. Additionally, an injunction will protect those customers and fleet industry participants who may believe they are dealing with Plaintiffs Arval or Element, or their

Alliance, from being misled when in fact, they are in contact with Defendants, which offer no fleet management services, other than Mr. Clifton's advise in the form of "white glove customer service and competitively priced bespoke solutions." (Doc. 36-6). See WFTV, Inc. v. Maverik Prod. Ltd. Liab. Co., No. 6:11-cv-1923-Orl-28KRS, 2013 WL 311461, at *16 (M.D. Fla. June 18, 2013) ("An injunction would also service the public interest by protecting consumers from being misled and confused. . . ."); Sound Surgical Tech., 734 F. Supp. 2d at 1278 ("'In a trademark infringement or unfair competition case, a third party, the consuming public, is present and its interests are paramount.'" (quoting BellSouth Adver. & Publ'g Corp. v. Real Color Pages, Inc., 792 F. Supp. 775, 785 (M.D. Fla. 1991)). Defendants do not dispute that the public interest weighs in favor of a preliminary injunction, and the Court agrees.

It is hereby:

**ORDERED**:

1. Defendants' Motion to Dismiss (Doc. 30) is **DENIED in part** as follows:

   A. The Motion is **denied** to the extent that the Court determines that Plaintiff Element Financial Corporation has standing to assert a claim for a violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 25 U.S.C. 1125(d), as alleged in Count I of the Amended Complaint (Doc. 8).

   B. The Motion is **denied** as to Count I of the Amended Complaint (Doc. 8), which alleges that Defendants violated the Anticybersquatting Consumer Protection Act ("ACPA"), 25 U.S.C. 1125(d).

   C. The Motion is **denied** to the extent that the Court determines that the

Amended Complaint (Doc. 8) is pleaded in compliance with Rules 8 and 10, Federal Rules of Civil Procedure.

D. The Motion otherwise remains **UNDER ADVISEMENT**.

2. Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in Support, Injunctive Relief Sought (Doc 10) is **GRANTED**.

3. Effective immediately, Defendants J. Christopher Clifton, Bonnie Clifton, and Element Arval LLC, individually, and collectively, and their officers, agents, servants, employees, assigns, successors and attorneys, along with those persons in active concert with them who receive actual notice of this Order by personal service or otherwise, shall be, and they are, further, immediately and temporarily **RESTRAINED AND ENJOINED**:

(a) from registering, selling, trafficking, using or displaying the marks ELEMENT, ARVAL, ELEMENT ARVAL, or ARVAL ELEMENT in any order or combination, or colorable imitations thereof, or any names or marks that are confusingly similar to Plaintiffs' marks ELEMENT, or ARVAL, or any combination of words incorporating Plaintiffs' marks, as a business name, domain name, or mark, in any advertisement, website, or in any other communications in any manner in connection with the promotion, marketing, offer, sale, or advertising of any goods or services, including the sale of the intellectual property and the offer of goods and services in the fleet vehicle management services business;

(b) from transferring, releasing, deleting, or assigning any Domain Names, containing the Plaintiffs' Marks ARVAL or ELEMENT, individually or

in any combination with each other or other terms or words, and any other domain names that are identical or confusingly similar to Plaintiffs' marks or any other marks owned by Plaintiffs;

(c) from registering, trafficking in, or using, in any manner, the Plaintiffs' Marks ARVAL or ELEMENT, individually or in any combination with each other or other terms or words, and any other domain names that are identical or confusingly similar to Plaintiffs' Marks or any other Marks owned by Plaintiffs.

(d) from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (c) above.

4. This **Preliminary Injunction** shall remain in full force and effect pending resolution of the merits of this case, and further Order of this Court.

5. Defendants are required to remove all Domain Names containing the Plaintiffs' Marks ELEMENT or ARVAL, individually or in combination, including but not limited to those listed in Docket Entry 8-2, and the Element Arval LLC website from public view on the Internet during the pendency of this Preliminary Injunction. Alternatively, Defendants shall transfer the disputed Domain Names to Plaintiffs pending resolution of the merits of this lawsuit, see Sound Surgical Techs., 734 F. Supp .2d at 1278, and remove the Element Arval LLC website from public view on the Internet during the pendency of this preliminary injunction.

6. Pursuant to Rule 65(c), as a condition to this injunction, Plaintiffs shall post security **BOND** with the Clerk of the Court, on or before **4:00 p.m., on December 5,**

**2014**, in the amount of ten thousand dollars ($10,000.00), as security, the Court having determined that such amount is adequate for the payment of such damages as Defendants may be entitled to recover as a result of this Order. See Adidas AG v. Adidas2013online.com, No. 13-24398-CIV, 2013 WL 6667043, at *11 (S.D. Fla. Dec. 17, 2013) (ordering a Temporary Restraining Order based upon cybersquatting claim, and requiring Plaintiffs to post a bond in the amount of $10,000); Sound Surgical Tech., LLC v. Leonard A. Rubinstein, M.D., P.A., 734 F. Supp. 2d 1262, 1278 (M.D. Fla. 2010) (ordering Plaintiff to post a $5,000 bond to secure a preliminary injunction involving eight domain names); Dell, Inc. v. BelguimDomains, LLC, No. 07-22674-CIV, 2007 WL 6862342, at *5, 14 (S.D. Fla. Nov. 21, 2007) (ordering Plaintiff to post a $25,000 bond to secure a preliminary injunction involving at least 1,100 domain names that are confusingly similar to Plaintiffs' marks).[9]

7. Defendants' Motion to Transfer Venue to the Orlando Division of the Middle District of Florida (Doc. 29) remains **UNDER ADVISEMENT**.

**DONE AND ORDERED** in Jacksonville, Florida, this 21st day of November, 2014.

BRIAN J. DAVIS
United States District Judge

[9] The Court also considered Plaintiffs' request that the bond be set at the nominal amount of $1,020.00. See (Doc. 21 at 4). Defendants made no argument or showing regarding the appropriate amount of a security bond in this case.

jl

Copies furnished to:

Counsel of Record